NOT DESIGNATED FOR PUBLICATION

No. 124,621

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of HD DEVELOPMENT OF MARYLAND FOR the Year 2018 in Riley County, Kansas.

MEMORANDUM OPINION

Appeal from the Board of Tax Appeals. Submitted without oral argument. Opinion filed June 7, 2024. Reversed and remanded with directions.

*Michael A. Montoya*, of Michael A. Montoya, P.A., of Salina, for appellant.

*R. Scott Beeler* and *Brett C. Randol*, of Rouse Frets White Goss Gentile Rhodes, P.C., of Leawood, for appellee.

Before ATCHESON, P.J., ISHERWOOD and HURST, JJ.

HURST, J.: HD Development of Maryland (the Taxpayer) filed an equalization appeal with the Kansas Board of Tax Appeals (BOTA) to dispute Riley County's (the County) appraisal of one its properties for the 2018 tax year. After hearing competing evidence from the parties' respective certified appraisers, BOTA adopted the Taxpayer's appraisal, which was significantly lower than the County's appraisal. The County filed a petition for judicial review in this court, arguing that BOTA's decision is invalid for two reasons: (1) it erroneously applied the law by relying on the exclusionary rule set forth by a panel of this court in *In re Prieb Properties, L.L.C.*, 47 Kan. App. 2d 122, Syl. ¶ 8, 275 P.3d 56 (2012), which the Kansas Supreme Court recently overruled; and (2) it was based on factual determinations not supported by substantial evidence in light of the record as a whole. This court agrees with the County that BOTA's decision is invalid

1

because it erroneously relied on *Prieb* to the exclusion of other available evidence. BOTA's decision is therefore reversed and remanded with instructions to reconsider the value of the subject property without *Prieb*'s limitations. It is therefore unnecessary to address the County's second claim.

FACTUAL AND PROCEDURAL BACKGROUND

The Taxpayer owns a one-story, 97,241-square-foot big-box retail store constructed in 2002 (the Subject Property) that sits on about 12 acres of land in Manhattan, Kansas, and operates as a Home Depot. For the 2018 tax year, the County appraised the fee simple value of the Subject Property at $6,435,400. The Taxpayer disagreed with the County's appraisal and filed an equalization appeal with BOTA, claiming the accurate fee simple value of the subject property to be $4,786,530.

BOTA held two evidentiary hearings on the matter. The County's appraiser— who prepared an appraisal report for the Subject Property that was admitted into evidence— testified that the County initially appraised the Subject Property at $7,814,020 using the cost approach and $6,937,300 using the income approach. The County's appraiser stated that the County chose to rely on its income appraisal and, after adjustments, arrived at the contested value of $6,435,400.

The County also retained the services of a certified appraiser, Timothy Keller, who prepared another appraisal report that was also admitted into evidence. Keller testified at the first evidentiary hearing that the Subject Property should be a Class A investment property rather than a less-desirable Class B investment property. Keller agreed with the County that the highest and best use of the Subject Property, both as if vacant and as currently improved, was the existing use.

2

Keller employed all three appraisal methods—sales approach, income approach, and cost approach—and valued the Subject Property at $7,310,000 under the cost approach; $7,290,000 under the sales approach; and $7,070,000 under the income approach. Keller testified that to reach his cost approach appraisal, he started with land valuation using five recent comparable property sales and made adjustments based on market condition, location, size, and topography. Keller concluded the Subject Property's land value was $3,430,000. Keller then estimated the replacement cost of the Subject Property's improvements using a national subscription service—Marshall Valuation Service—and subtracted the total accrued depreciation which, when added to the land valuation, resulted in a cost approach appraisal of $7,310,000.

Keller testified that he reached his sales approach appraisal by identifying four recent sales of comparable big-box properties: a JC Penney, a grocery store, and a former Sears (all in Lawrence), and a Hobby Lobby in Columbia, Missouri. Keller performed an individual sale comparison for each sale and then adjusted the data based on both transactional and property characteristics such as market conditions, expenditures after sale, conditions of sale, location/access, quality, age, land-to-building ratio, and size. Based on the adjusted data from the comparable sales, Keller valued the Subject Property at $7,290,000 using the sales approach.

For the income approach, Keller looked at the lease rates of comparable properties to determine the Subject Property's potential gross income if not owner-occupied. Keller used five comparable commercial leases of properties in Manhattan, Overland Park, Garden City, Kansas City, and central Nebraska with adjustments for characteristics such as location/access, quality, age, and size. Keller then estimated a market vacancy rate to calculate an effective tax rate and, after adding it to the estimated direct capitalization rate, appraised the Subject Property at $7,070,000.

3

Keller testified that he included built-to-suit leases. The County's attorney asked Keller, "what steps did you take with regard to the built-to-suit leases to ensure that there was no consideration for other business value or business interest as *Prieb* describes?" Keller responded, "Yes, so these were lease operating memorandums that we received from the actual sale of the property. And I did the actual lease for the sale -- Lease 1, but the other leases, where I could, we actually had done an appraisal of it or I had information about the lease, and there was no reason to suspect that any of these leases had any additional consideration other than the real property." The County's attorney had the following exchange with Keller about the *Prieb* decision related to the value:

"[County's Attorney:] And did you feel that your analysis complied with what *Prieb* -- and you're familiar with *Prieb*, correct?
"[Keller:] Yes.
"[County's Attorney:] And did you feel your analysis complied with the requirements of that case?
"[Keller:] Yes.
"[County's Attorney:] And it is a fair statement, isn't it, that even big-box stores or properties are part of the 'market'?
"[Keller:] Yes.
"[County's Attorney:] And as long as you are able to utilize information to take out whatever business interests or other intangibles will be attributed to that lease, if you can do that, there's no reason you can't consider those part of your market rent, is there?
"[Keller:] No."

Keller testified that he believed the cost approach and income approach appraisals were the most reliable and therefore relied on those appraisals to reach a final value. Keller's report explained that the cost approach appraisal was "a good approach to value" because "[l]and value was estimated based on sales in the local market," "[c]onstruction costs were estimated based on Marshall," and "[g]iven the age of the subject and its design, depreciation was not significant and was extracted from other big box sales in the state." Keller's report explained that the income approach appraisal was "a good approach

4

to value" because "[s]ufficient rental data was available to estimate market rent for the subject including a lease in close proximity" and "[s]ufficient sales with capitalization rates were available for analysis and our estimate of the overall rate is well supported." Finally, Keller explained that the sales approach appraisal was "considered the weakest approach to value" because "[f]ee simple sales of newly constructed big box stores rarely occur" and "[t]he sales that are available are typically older and or located in second-tier locations." Keller arrived at a final fee simple value for the Subject Property of $7,200,000, which is about the average of his cost and income approach appraisals.

The Taxpayer also retained the services of a certified appraiser, Thomas Slack, who prepared an appraisal report that was admitted into evidence at the second evidentiary hearing. Slack determined that the Subject Property's highest and best use as if vacant was "to hold for future retail or industrial development or sale to an owner-user" and that the Subject Property's highest and best use as improved was "for continued use as a big box retail store or several stores." Slack performed all three appraisal methods used by Keller but relied "almost exclusively" on the sales approach appraisal to reach a final fee simple value. Slack's report explained that "[t]he Sales Comparison Approach is the best method to use in appraising the fee simple interest in real property when there are several recent fee simple big box sales to compare." Slack explained that "[t]he Cost Approach is not normally a reliable indicator of value for a property that is sixteen years old" and the income approach appraisal "is not as reliable in a fee simple analysis because market rental rates vary depending on the lease duration, the quality of the tenant, tenant improvements and other concessions, and because capitalization rates in the market vary based on the lease duration, credit worthiness of tenants, periodic rent increases or fixed rate leases, responsibility for operating expenses, etc."

For the sales approach, Slack's report explained that he "researched fee simple sales of large, single tenant or single-user big box retail buildings in Manhattan, Kansas, but found none." Therefore, Slack "expanded the research to included [*sic*] additional

5

properties within the region that includes seven sales in Kansas and five others in Iowa, Minnesota, Wisconsin and Illinois for detailed analysis." "The sales were chosen based on sale date, age of the improvements, location and comparability in use." All 12 sales used for comparison involved "freestanding retail buildings originally designed for single user retail use, similar in size to the subject property" that did not "require property rights adjustments as would be the case with a leased fee sale." Slack's appraisal evaluated big-box store sales such as Lowe's, Target, Dillons, Kmart, JC Penney, Macy's, Hobby Lobby, Walmart, and Menards. Slack made adjustments based on factors such as location, age, condition, size, design, and land-to-building ratio and reached a final value of $4,070,000 for the Subject Property.

While Slack ultimately relied almost exclusively on his sales approach appraisal, he also performed cost and income approach appraisals. Like Keller, Slack began his cost approach by estimating the Subject Property's land value using five comparable land sale transactions and adjusted the data based on location, size, and visibility. Using the cost approach, Slack valued the Subject Property's land at $1,850,000. Slack then used the Marshall Valuation Service—the same national subscription service Keller used—to estimate the replacement cost of the Subject Property's improvements. But, unlike Keller, Slack also consulted the owner to gather information about replacement costs. After adjusting for depreciation, which included obsolescence, Slack appraised the Subject Property at $4,060,000.

Slack also performed an income approach appraisal using 13 comparable big-box leases to estimate the Subject Property's potential gross income. Slack then subtracted the estimated total operating expenses to calculate the Subject Property's potential net operating income. Based on an estimated 8% market vacancy and credit loss rate and a 9.7% tax-loaded capitalization rate, Slack appraised the Subject Property at $3,760,000 using the income approach. Ultimately, Slack gave the sales approach "primary weight, as there were an adequate number of fee simple sales available and they indicate a

6

relatively clear pattern of value." Slack therefore adopted the sales approach appraisal as his final value for the subject property as $4,070,000.

Slack's report explained that he "reviewed Kansas case law as it relates to valuation for property tax purposes" and quoted excerpts from *Prieb*. He also had this exchange with the Taxpayer's attorney at the second evidentiary hearing:

> "[Taxpayer's Attorney:] And you cite to *Prieb* on this Page 14 and talking about big-box facilities presenting unique appraisal challenges. Do you see that; that's the last paragraph on Page 14.
> "[Slack:] Yes.
> "[Taxpayer's Attorney:] And again that's a quote right out of the leading case authority in Kansas?
> "[Slack:] Right. Right. It's actually -- it's *Prieb* quoting *Prieb*, through the first *Prieb*.
> "[Taxpayer's Attorney:] All right. And the last sentence that you include in that quote, I think I want to find out if it attaches to your testimony a second ago. But it says: There's no indication that the County made any adjustment in its appraisal to account for functional obsolescence that arises when a big-box property that was built to suit the particular purposes of one retailer is sold in a hypothetical sale for use by another retailer or, for that matter, by the same retailer who would pay no higher rental rates than the next competitor. Is that what you were talking about a second ago?
> "[Slack:] Exactly.
> "[Taxpayer's Attorney:] So, in other words, you told us that build-to-suit means to meet the specific needs of the first user?
> "[Slack:] It is.
> "[Taxpayer's Attorney:] And so, if there is a second tier or second generation sale, basically, they have to build to suit for themselves all over again in terms of the improvements?
> "[Slack:] Well, they're going to -- they're certainly going to convert them to their requirements and paint the exterior, you know, the Walmart's colors for their colors, and Home Depot's colors for their colors, but --
> "[Taxpayer's Attorney:] They all have specific designs of interior space, do they not?

"[Slack:] They all have specific designs of exterior space and interior space on -- you see on occasion a transfer that involves one of these properties, one of these major entities buying something that was occupied by one of the other major players. But it's -- but they're few and far between. And they do typically make fairly significant changes to meet their own models. You know, Walmart has Type A, Type B format, and they build them a certain way so that the delivery people know where they're going. And if they transfer a manager from one location to another location, that manager comes in and knows the property inside and out because it's similar to another property that they own. And that's why if they're going to purchase another one and convert it to their use, they're not going pay physically depreciated costs.

"[Taxpayer's Attorney:] In other words, if they have to come in and demise those improvements to change them for their specific footprint or purposes, they're not going to pay for the value of what was there?

"[Slack:] Correct.

"[Taxpayer's Attorney:] And that's typical in your experience when one of these build-to-suit sells?

"[Slack:] It is typical.

"[Taxpayer's Attorney:] All right. You continue with your quotations from the *Prieb* cases on Page 15, and they note there, and this is the Court: We agree with one noted commentator when stated that when valuing the fee simple estate, the appraiser, theoretically, should approach the valuation as if the property were vacant and available to be leased at market rent, recognizing the necessary adjustment for lease up to stabilized occupancy. You've read that before, correct?

"[Slack:] I have.

"[Taxpayer's Attorney:] And is that commentator David Lennhoff?

"[Slack:] Yes.

"[Taxpayer's Attorney:] And you're familiar with his writings and treatises?

"[Slack:] I am. I am. I know David.

"[Taxpayer's Attorney:] Would you agree that he is a recognized authority in the appraisal industry?

"[Slack:] Right. He is.

"[Taxpayer's Attorney:] All right. So he agrees apparently that the property should be vacant -- considered vacant and available?

"[Slack:] That's his position, yes.

8

"[Taxpayer's Attorney:] Which would be consistent with yours and with the Uniform Standards?

"[Slack:] Right. I've discussed with him the fact that I think it has to be available, and in that, it could be owner-occupied, and the owner's going to sell it and vacate it, so it's not necessarily vacant and available. And that's what -- you know, back on the prior page where I wrote that -- or for that matter, the same retailer would pay no higher rent than the next competitor. And the reality, though, is that Court of Appeals says: As if vacant and available. And so that's the law in Kansas, and that's what I did.

"[Taxpayer's Attorney:] All right. You cited again from *Prieb* in that same -- the first full paragraph on Page 15. The Court further noted that, quote, a lease never increases the market value of real estate property rights to the fee simple estate.

"[Slack:] Right.

"[Taxpayer's Attorney:] Never, correct? So it's never an increase. That's the statement, isn't it?

"[Slack:] Yes."

The County retained the services of another certified appraiser, Bernie Shaner, to review Slack's appraisal. Shaner concluded that Slack's "value opinion is not reliable" because Slack "failed to consider the present use of the property as a home improvements store as a potential highest and best use." Shaner argued that Slack "failed to consider the strength of this submarket, as evidenced by strong occupancy for big box stores of all types in the county" and, because Slack "ignored the present use as a potential highest and best use, the entire valuation process was flawed." Shaner further asserted that Slack "used sales of properties in the sales comparison approach that are significantly inferior for a variety of reasons" and "[m]ost of the comparable sales do not have the same, or even similar highest and best use."

Shaner testified that he was "troubled" that Slack almost exclusively considered fee simple sales of big-box stores in his sales approach appraisal rather than considering more leased fee sales and build-to-suit property sales because "that's just one more adjustment. We adjust for location and size and age and condition and all kinds of things.

9

And many of those adjustments are certainly more speculative in calculating the adjustment or leased fee term." Shaner similarly stated in his report that "[w]hile the reviewer agrees that such adjustment may be necessary, the reviewer does not agree that sales of first generation home improvement stores should not be considered at all. It is no more speculative to adjust for lease terms than it is to adjust for location, age and condition, design, quality, or several other factors." "The reviewer suggests that the appraiser could as easily have found a leased fee sale or two that were far more similar in design, quality, age and even location than any of the fee simple sales that he did use, and the leased fee sales would have been better comparables."

In March 2021, BOTA issued a summary decision valuing the Subject Property at $4,070,000. BOTA explained its conclusion:

> "Upon review of all of the evidence and arguments presented, the Board finds the appraisal sponsored Taxpayer expert witness Thomas Slack was best at complying with the *Prieb* instructions. Mr. Slack's [*sic*] relied primarily on his sales approach, which focused on sales he deemed 'fee simple' sales as they were not subject to a lease. While there are a myriad of ways/methodologies to comply with *Prieb*, the Board finds, in this matter, Mr. Slack's appraisal best accomplished this task. For these reasons, the Board concludes that Mr. Slack's opinion of value of $4,070,000 is appropriate for the subject property for the 2018 tax year."

Pursuant to K.S.A. 74-2426(a), the County requested that BOTA issue a full and complete opinion explaining its decision. In June 2021, BOTA issued a full and complete opinion in which it elaborated on its conclusion:

> "This appeal concerns the proper determination of the fair market value of the subject property. As in prior big-box appeals adjudicated before this tribunal, the appraisal experts are tasked with performing an appraisal that accurately determines the market value for the subject real property. . .In *Prieb*, the Kansas Court of Appeals specifically cautioned against the use of build-to-suit lease transactions (which the Court

10

found to be essentially financing agreements not probative of market lease rates) as comparables in an income approach without a 'disentanglement by adjustments.'

"Herein, the County relied on the Keller appraisal, which placed most emphasis on Keller's cost and income approaches. Keller's income approach examined five lease comparables — three of which were build-to-suit leases (#1, #3, and #4), and two of which were second generation leases (#2 and #5). The Board finds no evidence indicating how Keller adhered to the *Prieb* mandate against using build-to-suit lease transactions without a 'disentanglement by adjustments.' The Board finds no appraisal attempts by Keller to 'tease out the business/intangible element of the going concern [for these build-to-suit lease comparables] and thereby arrive at the fair market value of the underlying real estate alone.' Given that the majority of leases used in Keller's income approach do not comply with *Prieb*, the Board finds little, if any, probative value in this methodology.

"Keller's comparable sales approach examined sales of three big-box properties from Lawrence, Kansas and one from Columbia, Missouri. The Board finds that Keller did not rely on this approach nor did his appraisal include significant discussion regarding this approach, as he noted the difficulty in finding fee simple sale comparables that were not significantly older and/or in locations that were inferior to that of the subject property.

"For his cost approach, Keller's land value was significantly greater than that determined by Slack ($5 per square foot for Keller and $3.50 per square foot for Slack) although the appraisers used many of the same land comparables. . . . The Board finds that the land sale comparables, after adjustments, support Slack's contention that the land on the west side of Manhattan has greater market value than land on the east side of Manhattan where the subject property is located.

"Keller's cost approach next concluded a total depreciation of 36.30%, whereas Slack concluded a total depreciation of 68%. A significant difference between these appraisals lied in the respective external obsolescence determinations. Using his improved sales comparables from his sales approach, Keller concluded that the subject property did not suffer from any external obsolescence. Slack, in contrast, determined substantial external obsolescence via his income analysis that compared the difference between the subject property's market income and the income the property would have to

11

produce to be worth the physically depreciated cost. As Keller himself concluded that there was significant disparity between his sales comparables and the subject property, the Board questions the accuracy of Keller's depreciation determination using these same sales comparables.

"As stated above, Slack placed most weight on his sales approach. Slack's comparable sales approach relied on eleven fee simple sales and one leased fee sale. Seven of these comparables were located in Kansas with improvements generally older than the subject property, yet Slack also examined five out of State sales comparables that were very close to the subject property in age. The Board finds Slack presented detailed demographic data for all of these comparables, which he relied upon in performing appraisal adjustments to account for the differences between these comparables and the subject property. Slack also discussed sales of other big-box stores in other cities.

"While the Board has not been persuaded that the subject property suffers from poor site visibility as asserted by the Taxpayer, the Board does find Slack's evidence of Manhattan's negative absorption rate as a percentage of inventory for the period 2014 to 2018 and zero percent growth in available square foot for the seven-year period from 2012 to 2018 to be uncontroverted. Overall, Slack competently selected comparables and performed appropriate appraisal adjustments to distill out the subject property's fee simple value and, therefore, appraise the subject property in accordance with applicable law. On balance, the Board finds Slack's appraisal to be more persuasive than the appraisal evidence presented by the County. For these reasons, and again noting that the material deficiencies in the Keller appraisal, the Board finds and concludes that the appraisal sponsored by Taxpayer expert Thomas Slack to be the best indicator of value presented. Therefore, the Board concludes that the appraised value of the subject property for the 2018 tax year is $4,070,000. [Citations omitted.]"

The County petitioned for reconsideration, which BOTA denied after hearing oral arguments on the matter. The County thereafter petitioned for judicial review in this court.

12

The County makes two claims for judicial relief. First, the County argues that BOTA erred in relying on a decision from a panel of this court, *In re Prieb Properties, L.L.C.*, 47 Kan. App. 2d 122, which the Kansas Supreme Court subsequently overruled. *See In re Equalization Appeal of Walmart Stores, Inc.*, 316 Kan. 32, Syl. ¶ 3, 513 P.3d 457 (2022) (overruling the exclusionary rule established in *Prieb* that "rental rates from commercial build-to-suit leases do not reflect market conditions and may not be relied on by appraisers without adjustments"). Second, the County appears to claim that BOTA lacked sufficient evidence to support its valuation.

This court reviews BOTA decisions in accordance with the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. K.S.A. 74-2426(c); *Walmart*, 316 Kan. at 46. The KJRA only permits judicial relief from state agency action for certain statutorily enumerated reasons:

> "(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;
> "(2) the agency has acted beyond the jurisdiction conferred by any provision of law;
> "(3) the agency has not decided an issue requiring resolution;
> "(4) the agency has erroneously interpreted or applied the law;
> "(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;
> "(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;
> "(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

*BOTA Erroneously Applied the Law by Limiting Its Review Based on* Prieb*.*

While the County lacks some specificity in identifying the KJRA provision warranting relief, this court identifies the County's first claim as one that BOTA "has erroneously interpreted or applied the law" under K.S.A. 77-621(c)(4)—which the County cited in its Petition for Judicial Review. See, e.g., *EagleMed, LLC v. Travelers Insurance*, 315 Kan. 411, 419, 509 P.3d 471 (2022) (inferring statutorily enumerated basis for judicial relief when appellant failed to specify one); *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 697, 216 P.3d 170 (2009) (explaining that specificity "is important because a court reviewing an administrative agency's action may grant relief only if it determines one or more of those provisions is violated"). This court exercises unlimited review over BOTA's interpretation and application of the law, without deference to BOTA's decision. *Walmart*, 316 Kan. at 46. As the party challenging BOTA's decision, the County bears the burden of proving the error. K.S.A. 77-621(a)(1); 316 Kan. at 46.

Relevant to BOTA's decision and this court's review, a panel of this court in *Prieb* held that "[r]ental rates contained in or reflected by commercial build-to-suit leases are not reflective of market conditions and may not be utilized for purposes of the income approach or the sales comparison approaches to value for ad valorem tax purposes in Kansas without a disentanglement by adjustments." 47 Kan. App. 2d 122, Syl. ¶ 8. In reaching this decision, the panel reasoned:

"A commercial build-to-suit lease is essentially a financing agreement between a lessor and lessee, and the rental rates therein are based in large part upon the revenue needed to amortize the investment required for the contemplated construction—plus a measure of profit—over the lease term or extensions thereof. Accordingly, when one

14

takes a snapshot view of rental rates at any time during such a lease, these rates are not reflective of market rent but rather just reflective of the rate required in that specific situation to continue an agreed revenue stream to amortize the lessor's investment, subject to a host of financial risks. In other words, contract rents in a build-to-suit lease are not designed to capture market value for each period within the lease term, but rather are designed to amortize an investment made at the outset and may vary dependent on factors that are unrelated to the real estate market thereafter." 47 Kan. App. 2d 122, Syl. ¶ 7.

However, while the County's petition for judicial review was pending in this court, the Kansas Supreme Court overruled the relevant holding in *Prieb*, explaining that "*Prieb*'s rationale invades BOTA's longstanding province as the fact-finder in the statutory process for appraising real property at its fair market value for ad valorem tax purposes." *Walmart*, 316 Kan. at 34. The court found the decision in *Prieb* "effectively prohibit[ed] BOTA from relying on any expert opinion that build-to-suit rents reflect the market rent for a property unless the expert 'adjusted' or 'disentangled' the data," and it made "no allowance for when an expert testifies adjustments are unnecessary under the circumstances." 316 Kan. at 57. "By following *Prieb*," the court reasoned, "BOTA imposed an exclusionary rule on the County's evidence—rather than simply considering its weight and credibility." 316 Kan. at 34. Although the parties disagree on the outcome, they agree that the court's *Walmart* decision applies to this case. See, e.g., *Stechschulte v. Jennings*, 297 Kan. 2, 18, 298 P.3d 1083 (2013) (Generally, new opinions of the Kansas Supreme Court are "binding on all other future cases and all cases still pending on appeal when the new opinions are filed.").

The County urges this court to reverse and remand BOTA's decision, alleging BOTA's erroneous adherence to *Prieb* limited its review and thus impacted its ultimate valuation. The County claims that "[t]he Taxpayer's appraisal methodology was predicated upon valuing property as if vacant even though the subject property was not vacant" and that Slack "testified that it was his belief and understanding that *Prieb*. . .was

15

the controlling law in Kansas." The County further argues that BOTA excluded evidence from its appraiser for failing to comply with *Prieb*.

The Taxpayer does not deny that its appraiser relied on *Prieb* but contends that "even after Walmart, an appraiser's methodology may still align with *Prieb*. . . .". The Taxpayer argues that BOTA simply found its appraiser more credible and, therefore, this court should affirm BOTA's decision. In the alternative, the Taxpayer argues that any reliance on *Prieb* was harmless because there is no evidence BOTA's decision would differ absent *Prieb*'s constraints. And finally, the Taxpayer asserts that if this court reverses and remands BOTA's decision, it should limit BOTA's review to the current record, arguing that the parties "were given a full and fair opportunity to present all of their evidence . . . and no evidence was excluded by BOTA."

Contrary to the Taxpayer's contention, BOTA directly relied on *Prieb* in evaluating the competing property valuations and underlying appraisal methods. BOTA's summary decision explained that it adopted the Taxpayer's appraisal from Slack *because* it best complied with *Prieb*: "Upon review of all of the evidence and arguments presented, the Board finds the appraisal sponsored Taxpayer expert witness Thomas Slack was best at complying with the *Prieb* instructions." Although BOTA noted there are different ways an appraiser could comply with *Prieb*, it adopted Slack's appraisal because it "best accomplished this task." The County's expert, Keller, primarily used the cost and income approaches to determine the fee simple value of the Subject Property. In its full and complete opinion, BOTA noted that Keller failed to adhere "to the *Prieb* mandate against using build-to-suit lease transactions without a 'disentanglement by adjustments.'" Therefore, "[g]iven that the majority of leases used in Keller's income approach do not comply with *Prieb*, the Board finds little, if any, probative value in this methodology." BOTA credited Slack's appraisal *based on* its adherence to *Prieb* and discounted Keller's methods that did not comply with *Prieb*. Essentially, compliance with *Prieb* was a minimum prerequisite for BOTA to consider the appraisal reliable.

16

While the Taxpayer is correct that the court's holding in *Walmart* does not prohibit BOTA from weighing competing appraisals and finding ones that comport with *Prieb* to be more reliable, that is not what occurred here. There is no evidence that BOTA weighed Keller's income approach against Slack's income approach related to anything other than Keller's failure to adhere to *Prieb*. BOTA limited its review and failed to weigh the probative value of Keller's income approach exclusively because it determined that he failed to adhere to *Prieb*, which is inconsistent with the court's holding in *Walmart*. 316 Kan. at 62-63. Additionally, BOTA's belief that Keller failed to follow the established precedent in *Prieb* could have influenced its overall reliability determination. Here, BOTA did exactly what the Kansas Supreme Court warned against in *Walmart*: "*Prieb*'s rule of law effectively prohibit[ed] BOTA from considering expert opinions based on unadjusted data, even when the experts argue their methodologies arrive at a fair market value appraisal in conformity with generally accepted procedures and standards as required by state law." 316 Kan. at 34. BOTA's refusal to consider Keller's income approach appraisal based on *Prieb* is contrary to the court's holding in *Walmart*, which requires BOTA to engage in fact-finding as the highest administrative tribunal to determine the reliability of conflicting appraisals without the limitations set forth in *Prieb*. *Walmart*, 316 Kan. 32, Syl. ¶¶ 1-3.

Before deciding whether BOTA's reliance on *Prieb* requires reversal, this court "must consider the harmless error rule" related to BOTA's action. *Sierra Club v. Mosier*, 305 Kan. 1090, Syl. ¶ 15, 391 P.3d 667 (2017); See K.S.A. 77-621(e). To show BOTA's error was harmless, the Taxpayer—as the party benefitting from the error—must show there is no reasonable probability the error affected BOTA's decision in light of the entire record. *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012). In reaching its decision in adopting the Taxpayer's appraisal, BOTA relied on *Prieb* to elevate Slack's appraisal and to discount Keller's appraisal. As explained above, the record clearly shows that BOTA did not merely favor *Prieb*'s analysis but relied on it to refuse to consider alternative appraisal methods without analyzing those appraisals.

17

The Kansas Supreme Court has overruled *Prieb*'s exclusionary rule, and BOTA's reliance on *Prieb* is therefore an error in the interpretation and application of the law under K.S.A. 77-621(c)(4). In relying on *Prieb*'s exclusionary rule and discounting Keller's income approach, BOTA limited the evidence it considered, and this may have impacted BOTA's overall reliability determination. Therefore, the Taxpayer cannot show there is no reasonable probability this error affected BOTA's decision. Having found that BOTA relied on an erroneous interpretation and application of the law, and that such error was not harmless, this court must reverse and remand BOTA's decision for reconsideration in light of *Walmart*. 316 Kan. at 62-63. As the court explained in *Walmart*, "[t]hough BOTA may reach the same result on remand, that decision must be based on its own determinations of the facts and witness credibility" without limiting or excluding such evidence based on *Prieb*. 316 Kan. at 34-35.

Finally, the Taxpayer's argument that BOTA's reconsideration on remand must be limited to the existing record is unpersuasive. First, BOTA—as the highest administrative tribunal—is responsible for weighing all relevant evidence in making its determination. Second, both Slack and Keller performed their appraisals based on *Prieb*; thus, without consideration of *Prieb*, there may be additional evidence the parties want to submit. It is BOTA's prerogative to determine, based on the circumstances of this case, if it needs additional or different evidence beyond the current record. Therefore, on remand BOTA shall determine the scope of the record for its reconsideration.

It is unnecessary to address the County's second claim because this case is reversed and remanded for reconsideration based on BOTA's erroneous reliance on *Prieb*.

18

CONCLUSION

BOTA erroneously relied on *Prieb*'s exclusionary rule to reach its appraised value of the Subject Property. BOTA's decision is therefore reversed and remanded with instructions to reconsider the value of the Subject Property without *Prieb*'s constraints.

Reversed and remanded with directions.